**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

CIVIL ACTION NO.

_____

CARL S. JOHNSON                          )
                                         )
                                         )
          Plaintiff                      )
                                         )
v.                                       )
CITY OF WORCESTER, LT. CARL SUPERNOR     )
PATRICK MORAN, STEVEN BONCZEK,           )
TERRENCE CAHILL, OFFICERS DOES 1-4       )
JOHN DOE CONFIDENTIAL RELIABLE           )
INFORMANT                                )
                                         )
          Defendants                     )
_____  )

**PLAINTIFFS' COMPLAINT AND REQUEST FOR JURY TRIAL**

**INTRODUCTION**

This is a civil rights action by Carl S. Johnson against the City of Worcester, a group of Worcester police officers, their immediate supervisor and the chief of police at the time, for unconstitutional searches of his naked body and anal cavity in public on August 28, 2014. When these warrantless searches produced no drugs or contraband of any kind, the defendants moved on to plaintiff's home nearly a mile from the arrest location. There they did what they called a "protective sweep," another search without warrant or probable cause, resulting in criminal charges a Massachusetts District Court Judge dismissed based on the defendants' misconduct.

Plaintiff submits that the officers involved in this incident would not have acted as they did but for failures of the City and its police chief to provide appropriate training, supervision, and discipline to assure officers conducted themselves according to law in searching the homes, persons, and body cavities of people.

## JURISDICTION

1.  Plaintiff brings this action pursuant to Massachusetts State Civil Rights Statute, common law of tort, the Massachusetts Declaration of Rights, and under federal law 42 U.S.C. § 1983 for violation of his rights under the  Fourth and Fourteenth Amendments to the United States Constitution.

## PARTIES

2.  Plaintiff Carl S. Johnson ("Mr. Johnson") is and was at all pertinent times, a resident of Worcester, Massachusetts.

3.  Defendant City of Worcester ("the City") is a duly chartered municipal corporation of the Commonwealth of Massachusetts with a place of business abode located at 455 Main Street, Worcester, Worcester County, Massachusetts.

4.  Defendant Gary Gemme ("Chief Gemme") was at all pertinent times a duly appointed and sworn Worcester police officer and Chief of Police. He resides in Worcester, Worcester County, Massachusetts.

**5.**  Defendant Lt. Carl Supernor ("Lt. Supernor") was at all pertinent times a duly appointed and sworn Worcester police officer, and he resides in Worcester County, Massachusetts. His actions in this complaint were taken under the color of law.

6.  Defendant Officer Patrick Moran ("Officer Moran") was at all pertinent times a duly appointed and sworn Worcester police officer, and he resides in Worcester County, Massachusetts.

7.  Defendant Officer Steven Bonzcek ("Officer Bonzcek") was at all pertinent times a duly appointed and sworn Worcester police officer, and he resides in Worcester County, Massachusetts.

8.     Defendant Officer Terrence Cahill ("Officer Cahill") was at all pertinent times a duly appointed and sworn Worcester police officer, and he resides in Worcester County, Massachusetts.

9.     Defendant Officers Does 1-4 were at all pertinent times a duly appointed and sworn Worcester police officers whose identities are unknown at present but who reside in Worcester County, Massachusetts.

10.    John Doe, a so-called confidential reliable informant ("CRI"), whose identity is allegedly known to one or more of the officer defendants but at present not to the plaintiff, is a fictional character identified by Defendants in the arrest report of Mr. Johnson.

11.    Each individual defendant is sued in his or her personal capacity.

## FACTS

12.    The conduct of each defendant as set forth herein took place in the course of his or her employment as a sworn police officer of the City

13.    On August 28, 2014 at approximately 7 pm Mr. Johnson drove his car to pick up a friend, Mr. Threats, who lived at 26 Dayton Street in Worcester.

14.    Unbeknown to Mr. Johnson he was being followed by Officer Moran, a detective Worcester Police Department ("WPD") vice squad along, and other vice squad detectives working with him in an alleged drug investigation.

15.    At that time and place officers Moran, Bonzcek, Cahill and Does 1-4 were under the command and supervision of Lt. Supernor, who at the time was a police sergeant in the vice/narcotics unit.

16. Moran falsely claimed in a report of August 28, 2014 that two weeks earlier a police informant had made "a controlled purchase of crack cocaine from this vehicle and Johnson was the seller of the crack cocaine. . . .This controlled buy was conducted using a confidential and reliable informant."

17. Moran made this statement in an official report knowing it to be false, i.e. knowing no confidential or reliable informant who had made any controlled buy of drugs from Mr. Johnson.

18. Mr. Johnson picked Mr. Threats at his house at 7pm, and from there the Officer Moran and the other vice squad detectives followed them to the intersection of Hampden and Fruit Streets, which is a 90-degree intersection.

19. Dayton Street and Fruit Street also intersect at a 90 degree angle while Hampden and Dayton Street are parallel to one another.

20. In his police report Officer Moran stated Officer Bonczek observed Mr. Johnson picking Mr. Threats up on Fruit and Hampden Street in Worcester and then observed Mr. Threats exit Johnson's car after a short period of time.

21. No defendant saw or noted in any report any exchange of money or contraband, between Johnson and Threats.

22. But Officer Moran surmised that "a street level drug transaction had occurred."

23. He followed Mr. Threats, approached him and identified himself as an officer, at which time Threats threw something behind his back which officer Moran believed to be drugs.

24. Officer Moran seized Mr. Threats, placed him against a car and threatened to break his arm if he moved.

25.  Officer Moran retrieved the item Threats had discarded which he described in his report as a small white colored chunk in a small knotted plastic bag.

26.  Believing this to be crack cocaine, Officer Moran arrested Mr. Threats.

27.  Defendants followed Mr. Johnson until his vehicle reached the intersection of Dewey and May Street, where the officers stopped him and he complied with an order to "Get the fuck out of the car."

28.  To further justify the illegal stop and the search and seizure that followed Officer Moran made another false statement claiming when they stopped Mr. Johnson police "…[c]onfiscated from the person of Johnson was $40.00 in cash that was in his hand…" Mr. Johnson had no money in his hand when stopped or approached by police.

29.  When Defendants' stopped Mr. Johnson he was on the phone and he was talking to his ex-wife on a cell phone, and the conversation abruptly ended.

30.  Once out of the car Mr. Johnson was ordered to "get on the fucking ground" and when he declined to do the officers seized him, placed him in handcuffs and took his car keys, phone and hat.

31.  When Mr. Johnson asked the officers what the problem was he was told "You don't fucking know?" and an officer Mr. Johnson describes as short in stature advised him to make it easy on himself, and "Where is the rest of it?"

32.  Officers went through Mr. Johnson's wallet and began searching his car as he was brought to the rear of the vehicle.

33.  A police transport wagon arrived at the scene and when the back doors were opened Mr. Johnson saw Mr. Threats inside.

34.  Police asked Mr. Johnson if he knew Mr. Threats and he told them he did.

35. Then Mr. Johnson heard a tall officer order that Johnson be brought into the wagon so he could be strip searched, and when another officer asked, "You are going to do it right here?" the tall officer said, "What the fuck, yeah."

36. The officers did not have probable cause to strip search Johnson, and he at no time consented to such a search.

37. He was ordered to pull down the swimming trunks he had on but pointed out he could not do this with his hands cuffed behind his back.

38. The shorter officer and the tall one who had ordered the search then pulled his trunks down to the ankles exposing his genitals and buttocks.

39. He was forced to kneel, ordered to cough, then stood up and bent over as an officer placed his hands on and spread Mr. Johnson's buttocks, he was ordered again to cough.

40. The defendant who manipulated Mr. Johnson's buttocks conducted a cavity search as defined by the WPD policy on strip searches.

41. The officers laughed at and ridiculed Mr. Johnson as they performed this search.

42. He was handcuffed and in custody at the time and was powerless to resist the search, which took place in the presence of Mr. Threats.

43. Mr. Johnson told them "You are not supposed to do that but who am I to stop you."

44. Defendants' actions were undertaken to demean and humiliate Mr. Johnson.

45. No reasonable officer would have done such a substantial intrusion of his right to privacy and bodily integrity, nor would any reasonable officer have conducted a legal strip search in this manner.

46. The actions of the Defendants' in strip searching and conducting a cavity search upon Mr. Johnson served no lawful purpose, nor could any Defendant officer have reasonably

believed it would have served a lawful purpose.

47.     Defendants' confiscated a small amount of cash from him and the shorter officer drove

        with Mr. Johnson's car over his phone damaging it.

48.     No drugs were found on Mr. Johnson or in the car he was driving.

49.     Mr. Johnson was transported to the Worcester police station where he remained

        incarcerated until approximately 2 AM before being released on bail.

50.     Officer Moran and Lt. Supernor maliciously charged Mr. Johnson with Distribution of

        Class B substance despite having found no contraband on him or his car and lacking

        probable cause to charge him.

51.     On returning to his apartment at 982 Main Street, Worcester Mr. Johnson saw open

        drawers in the living room in his bedroom his mattress had been lifted, in his bathroom

        he found one of his keys confiscated by police demonstrating his apartment had been

        searched.

52.     A tall officer told Mr. Johnson they were going to search his home whether he consented

        or not after Mr. Johnson told him it was illegal to do so.

53.     The police, who had taken his house keys, at the time of the arrest, never asked for or

        received Mr. Johnson for permission to search his apartment.

54.     Instead the defendants conspired to search his dwelling without warrant or probable

        cause.

55.     The apartment was about nine-tenths of a mile from the arrest location, and Mr. Johnson

        had left it locked and secured.

56.     Defendants' arrived at the building and made contact with Johnson's son, Kipko Johnson

        who had gone to check on his father after hearing from Johnson's common law wife that

something had happened to him.

57.   Kipko Johnson had they keys to his father's apartment, which he entered and then left when he found Johnson was not home.

58.   Kipko Johnson was walking back to his car when Officer Moran and other defendants stopped him and asked him if there was anyone inside the apartment.

59.   Kipko Johnson told Defendants he had just left the apartment and no one was inside.

60.   The officers, on the pretext of doing a "protective sweep" then searched the apartment.

61.   Officer Moran explained to Kipko Johnson that his father was being investigated for sale of drugs, and remained with Kipko outside the building as three officers entered the building and let themselves into the apartment, where they remained for more than half an hour.

62.   At one point Kipko Johnson asked Officer Moran whether he could go inside his father's apartment to see what the three officers were doing there, and Moran answered, "We're not done."

63.   In his report of this warrantless search Officer Moran created a ruse to justify it, stating falsely he had "asked Kipko if anyone else was inside the apartment.  He stated he was not sure."

64.   Officer Moran next wrote "At this point P.O. Terrence Cahill knocked on the door and waited and received no response from within."

65.   Officer Moran then falsely wrote "He [P.O. Cahill] then used the key taken from Johnson to open the apartment door to perform a protective sweep. There were no other people inside the apartment but there was a television on inside.  Officers then exited the apartment and secured it with the keys."

8

66.     His false statement suggested Defendants' simply walked quickly to do a well-check into Mr. Johnson's apartment even when Mr. Johnson was already in police custody.

67.     Officer Moran made this false statement of fact knowingly because a couple of officers stayed with Kipko Johnson in front of the 982 Main Street apartment while another group of Defendants' searched and rummaged through Mr. Johnson's apartment without a warrant hoping to find drugs they could charge Johnson with.

68.     Officer Moran wrote false statements in his police report knowing them to be false, and he did so with the knowledge and consent and knowledge of his supervisor, Lt. Supernor.

69.     The defendants searched and/or allowed the search of Johnson's apartment knowing none of their supervisors would question their conduct, because they knew this was consistent with the *de facto* policy and practice of the WPD and City of allowing warrantless searches without probable cause or with contrived pretexts.

70.     The warrantless search of Mr. Johnson's apartment was part of a custom and practice that existed in certain WPD units to conduct searches and seizures without a warrant and euphemistically describe them as "protective sweeps."

71.     Defendants' conducted a full-blown search of the apartment which Moran falsely and euphemistically described as a "protective sweep" was illegal and every defendant knew this to be the case.

72.     No reasonable police officer would have undertaken this action which served no lawful purpose, nor could any of Defendants' have reasonably believed it would have served a lawful purpose.

73.     No reasonable police officer or supervisor would have in good conscience described the full blown search of Mr. Johnson's apartment as a "protective sweep."

74.   Mr. Johnson was charged with possession of cocaine with intent to distribute, had retain a
      lawyer and had to go court to respond to criminal charges.

75.   On November 14, 2014 his criminal charges were amended to simple possession with
      intent to distribute class B.

76.   Mr. Johnson's lawyer brought a motion to dismiss his criminal charges arguing there was
      no basis for charging him.

77.   On July 14, 2015 Mr. the Honorable David P. Despatopoulos, Justice of the Worcester
      District Court dismissed the charge against Mr. Johnson, after learning reading the police
      report and learning from Mr. Johnson's counsel police officers had gone to his apartment
      to search it, commenting, "[t]here is this thing called the Constitution, maybe they [the
      police] should read it."

78.   But no one within the WPD or in the Worcester District Attorneys' office did anything to
      investigate the defendants' conduct.

79.   Sometime in 2015 Mr. Johnson's attorneys prepared a "Worcester Claim Form"
      complaining of the "Unlawful search of residence in connection with law enforcement
      activities."

80.   Only then did the WPD Bureau of Professional Standards ("BOPS") begin looking into
      Mr. the unlawful search and arrest of Mr. Johnson.

81.   The only person interviewed in the investigation was Mr. Threats – who stated that Mr.
      Johnson had not sold him any drugs.  No officers were interviewed by investigators from
      the BOPS.

82.   Months later police returned money they confiscated from Mr. Johnson and, after nine
      months, they returned the car they confiscated to his son Kipko Johnson.

83. No one was disciplined or ordered retrained by Chief Gemme, and he did not write to Mr. Johnson to inform him of any findings from the investigation.

84. Instead, the City of Worcester, through the Law Department, attempted to negotiate a financial settlement with Mr. Johnson that would have required secrecy.

85. The City proposed a settlement agreement stating: "Johnson further acknowledges and agrees that neither he nor his agents or representatives, including his attorneys, will make any presentment, formally or informally, of his claims or otherwise discuss or disclose anything whatsoever related to the Claim or the terms of this settlement, aside from the sole fact that the matter is settled…"

86. Mr. Johnson declined.

**Defendants' lack of compliance with the WPD's sated strip search policy**

87. At the time of Mr. Johnson's arrest the WPD had a written policy covering strip searches, Policy 720, a six-page document effective as of January 3, 2008. Ex. 1.

88. The policy provided *"At no time is a person to be searched without full respect for the dignity of that person."*

89. The policy provided that "normally strip search at the scene of an arrest is not necessary."

90. Policy 720 allowed strip searches but provided that they be done in a private room, or in a police wagon, when an officer had probable cause to think a suspect might be armed.

91. Policy 720 distinguished between "Visual body cavity search" and a "Manual body cavity search." A visual body cavity search encompassed a visual inspection of the anal and genital areas with those areas being opened and manipulated by the individual being searched.

92.     Policy 720 described a manual body cavity search, where the gloved hands of officers touch and manipulate a subject's private, such as the spreading of buttocks as was done to Johnson, "most intrusive, involves some degree of touching and probing of body cavities."

93.     Policy 720 provided: "Manual body cavity searches shall only be conducted by medical staff at a local hospital and upon approval by the officers' supervisor. . . .[and] may only be conducted pursuant to a search warrant, issued by a judge, based on a strong showing of particularized need supported by a high degree of probable cause. *Rodrigues v. Furtado,* 410 Mass. 878 (1991)."

94.     Each police officer and police supervisor who came in contact with Mr. Johnson on August 28, 2014 knew that a warrant was required for a manual body cavity search.

95.     Policy 720 required a police supervisor, in this case Lt.Supernor to make the determination whether or not a strip search and/or body cavity search should be conducted. P. 2

96.     Policy 720 required that a "Supervisor will ensure that every provision of this policy is complied with in those cases where a strip search, visual body cavity search and/or a manual body cavity search is to be performed." P. 2.

97.     WPD supervisors were responsible to review and forward the report of a strip of body cavity search through the proper channels to the Chief's office within 24 hours of the search. P. 2.

98.     Policy 720 required: "The strip search and/or body cavity search shall be recorded on the incident report which shall be forwarded through the channels to the Chief's Office outlining the reasons for the search, the facts supporting the requisite probable cause for

the search, the manner in which the search was conducted, the name of the officer

performing the search, the supervisor approving the search, the location of the where the

search was conducted, and the result of the search.

99. Despite its official written policy, at all pertinent times the WPD had and practice of

failing to document strip searches and manual body cavity searches.

100. No officer did a contemporaneous report of Johnson's strip search or cavity search or the

fact that his genitals or his buttocks were exposed.

101. The lack of contemporary report, with the knowledge or an on-site supervisor

demonstrates deliberate indifference to the rights of citizens and the existence of a code

of silence within the WPD.

102. In fact the police report signed by officer Moran and ultimately reviewed and signed by

Lt. Supernor did not mention that Mr. Johnson had been strip searched.

103. The policy required that strip searches and visual body cavity searches be conducted in a

non-humiliating, professional manner, and only for legitimate law enforcement or public

safety objectives.

104. Notwithstanding that the policy provided that no strip searches and/or visual body cavity

searches be conducted on camera or in the presence of non-police personnel, Mr. Threats

was present for and witnessed the strip search and cavity search of Mr. Johnson.

105. Defendants grossly deviated from their own policy in a number of ways,  including but

not limited to: conducting a strip search of Mr. Johnson without probable cause,

manipulating private parts of Mr. Johnson buttocks without a search warrant, conducting

an unlawful strip search in a police wagon knowing it would be witnessed by a civilian

such that non-police personnel were allowed to view the private/intimate parts of the

plaintiff, or by conducting it without a supervisor present, conducting the strip and cavity search in a humiliating and in a grossly unprofessional manner and by failing to document any of it in police reports.

**Other gross examples of unconstitutional WPD strip searches**

106.   There have been a number of lawsuits and incident of warrantless strip searches that primarily involve blacks and Latino's where individuals allege officers from the vice squad or gang unit beat them and strip search them.

107.   By way of example, in *Mangual v. City of Worcester, et al,* US District Court, CA No. 4:15-cv-40017-TSH, Document 4, filed 2/3/2015, plaintiff alleged that he was beaten by a group of vice squad detectives before being arrested, and while in custody by two detectives in the presence of vice squad Sergeant as Mr. Mangual was handcuffed during the execution of warrantless body cavity search.

108.   A video captures certain images of the incident while Mangual complains of being abused.

109.   During Mangual's warrantles strip and cavity search, Mangual demanded to be videotaped but police refused telling him it was against policy.

110.   During Mangual's warrantless strip and cavity search Mangual can be heard screaming while being abused and saying things like: "You keep slamming me on my face" or saying "Yeah, you're not going to beat me up, ah?  Beat me up in front of the camera" or "You mother fucking…There's no reason for you guys to be fucking hurting me… bro" only to be told by Lt.Early a vice squad supervisor "Nobody did that."

111.   Mangual is heard in the video screaming things like "Ah, your banging my ass, … 'What the fuck are you doing?'… You're fucking violating me… and after they conducted a

cavity search Mangual can be heard saying "Yeah, you're not going to beat me up. You are not going to beat me up, ah? Beat me up in front of the camera like that?... and "These hancuffs you need to loosen them brother. You fucked my shit up" only to be told by one of the officers that tortured him "Nobody did anything to you."

112.   In the case of *Juan R. Rivera v. City of Worcester, et al* US District Court CA No. <u>4</u>:17-cv-40029-TSH, (Document 1, 3/16/2017) plaintiff alleged that he was beaten by Worcester vice and gang officers (including two codefendants from Johnson's case  that came in contact with Lt. Supernor and officer Cahill) during a drug raid in which other arrestees were beaten while being stripped searched and handcuffed in which policed used racially derogatory language and one of the occupants alleged police confiscated from him more money than they reported.

113.   In *Rivera v. Worcester, et al*, there was at least one other individual who was beaten while strip search but whose name was not mentioned in any of the official police reports.

114.   In December 2014, Mr. Rivera's lawyer filed a motion to suppress which was heard by Judge D'Angelo in the Worcester District Court.

115.   District Court Judge, Andrew D'Angelo opined "In this case, based on the violations of the entire affidavit, along with the hope that this decision will deter such violations in the future, the Court finds suppression is necessary."

116.   But no police officer was ever disciplined (all of them were exceptionally cleared) even after Gemme ordered a cursory investigation of that case.

117.   In *Alex Lora v. City of Worcester, et al*, US District Court CA No. 4:13-cv-40131 TSH, (Document 1, 11/13/2013) Mr. Lora alleged that in April 2011 he was strip searched without a warrant and assaulted during a drug raid conducted by members of the

Worcester Police vice-squad, i.e. he alleged that he was struck in the face and ribs with fists and a large chunk of hair was pulled from his scalp and he gave police investigators from the WPD BOPS graphic photographs of his injuries and medical records.

118. According to Mr. Lora's complaint he was brought into a bathroom by officer Moran who ordered him to put his hand on his head before being strip searched.  "When the Plaintiff responded, "I know the routine," Defendant Moran struck the Plaintiff without provocation with such force that the Plaintiff fell over the toilet in the close quarters of the bathroom, landing on the floor." (Complaint at ¶ 12).

119. Lora also alleged in his complaint that as they beat him another vice office taunted him stating, "Cry, cry and inquiring, "Do you want to be a smart ass." (Complaint at ¶ 14).

120. At least two codefendants in Mr. Johnson's case were involved in the Lora case, i.e., officer Moran and Lt. Carl Supernor.

121. In 2015 the City paid Lora $36,000 to settle his federal civil rights lawsuit and yet no one was disciplined.

122. In *Luke Deptula v. City of Worcester, et al*, US District Court CA No. 4:17-cv-40055 (5/2/2017)TSH, Mr. Deptula who was the subject of a drug investigation, claimed he was grabbed by the throat, placed in handcuffs and punched repeatedly with close fist because police felt he had swallowed drugs. Deptula also alleged that one of his codefendants, a female was strip searched at a commercial store when stopped by police.

123. In *Jose L. Ortiz v. The City of Worcester, Sgt. Steve Roche*, *et al*, US District Court, CA No. 4:15-cv-40037-TSH, (Document 1, 2/27/2015) plaintiff, a livery driver at work was arrested but not never charged with any crime, alleged that he was intentionally pistol whipped during a drug raid by a police Sergeant during a vice-squad drug raid that

occurred in Worcester in March 2014.

124.   Mr. Ortiz alleged a defendant falsely reported how he got injured by a supervisor who falsely alleged that Ortiz disobeyed police orders and that as the detective extended his weapon towards Ortiz, Ortiz "quickly turned towards [Sgt. Roche] striking his eye lid on my weapon."

125.   Mr. Ortiz was notified by Chief Gemme in writing that his pistol whipping was justified, i.e. "It has been established that your complaint is exonerated in part, i.e. the act(s) occurred but the actions of the officers were justified, lawful and proper…"

126.   At least one other individual arrested during that drug raid was stripped searched and beaten by Worcester police detectives when police removed contraband from the area of his buttocks.

127.   Defendants in this case and their colleagues have been involved in numerous other unlawful strip and cavity searches of individuals that they have come in contact with.

128.   At the time of this incident the City of Worcester had a policy or custom of indifference to misconduct by Worcester police officers by failing to properly investigate complaints of misconduct and to discipline officers who used unreasonable or excessive force.

129.   The City of Worcester also had a policy or custom of tolerating a "code of silence" in which its officer understood that they were not to report misconduct by fellow officers.

130.   The City of Worcester developed a custom and practice of making it difficult for citizens to file complaints about the conduct of its officers.

131.   Once complaints of unreasonable force are filed, the Worcester police department allowed a custom to develop among its officers of failing to properly investigate these claims and failing to discipline officers who used unreasonable force.

132.   The Worcester police department also failed to monitor officer's use of force by ensuring that officers filed reports whenever someone taken into custody had a visible injury.

133.   These reports are required by law and by the City's police department policies.

134.   Worcester police officers routinely submit false or incomplete forms that do not report prisoners' injuries or the actual circumstances that led to the use of force.

135.   The City condoned this widespread violation of Massachusetts law as well as WPD's own internal policies.

136.   Because officers knew that they could get away with not reporting the actual force they used or the injuries they caused or the circumstances in which they occurred, officers felt free to use excessive force that caused injuries.

137.   The policies and customs of the City of Worcester led the defendants' in this case including, Officer Cahill, Lt. Supernor, Moran, Bonczek and others to think they could not be sanctioned for violating the rights of citizens by using unreasonable force, making arrests without probable cause, filing false reports and even testifying falsely in court and in other proceeding without sanction by the City.

138.   The City and the misconduct of the Chief of police included but was not limited to the following:

a)   Systemic failure to ensure that Defendants' and WPD officers did not fabricate evidence.
b)   Systemic failure to ensure that Defendants' and WPD officers prepared truthful reports.
c)   Systemic failure to ensure that Defendants' and WPD officers complied with departmental policies and procedures.
d)   Systemic failure to ensure that Defendants' and WPD officers used reasonable levels of force upon individuals and civilians their officers came in contact with.
e)   Systemic failures to ensure that Defendants' and WPD officers complied with their obligations regarding the processing, inspection, documentation and investigation of

injured prisoner reports under M.G.L. c. 276 § 33.

f)  Systemic failures to ensure Defendants' and WPD supervisory staff investigate complaints of civilian injuries at the time of booking.

g)  Systemic failures to ensure Defendants' and WPD supervisory staff provide prompt medical care to injured prisoners at the time of arrest and/or booking.

h)  Systemic failures to ensure Defendants' and WPD supervisory staff discipline those officers who use unreasonable force.

i)  Systemic failures to ensure defendants' and WPD supervisory staff retrain those officers who use unreasonable force.

j)  Systemic failures to ensure defendants' and WPD supervisory staff videotape the bookings of civilians especially those that claimed to have been injured by police and those who claimed to have been injured by excessive force.

k)  Systemic failure to ensure that WPD officers disclosed to prosecutors information that is favorable to criminal defendants.

139.  All of these deviations from WPD policies and procedures were the moving force behind the Defendants' violations of Mr. Johnson's civil rights.

## COUNT I

**42 U.S.C. § 1983: Unlawful Search and Seizure/ Strip Search Cavity Search**
**Lt. Supernor, Moran, Cahill, Bonczek, Does 1-4 and Confidential Informant**

140.  Each of the foregoing paragraphs is incorporated by reference.

141.  Defendants' conduct violated Mr. Johnson due process rights: not to be deprived of life, liberty without due process of law.

142.  Defendants' unlawfully conducted a strip and cavity search of Mr. Johnson violating his rights to privacy of his body as protected by the Fourth, Ninth, and Fourteenth Amendments to the United States Constitution.

143.  Defendants' unlawfully violated Mr. Johnson's bodily integrity.

144.  Defendants' arrested Mr. Johnson without probable cause.

145.  Defendants' unlawfully searched his apartment without any probable cause.

146.  These actions deprived Mr. Johnson of well-established rights under the United States Constitution including freedom from arrest without probable cause, and freedom from

unreasonable search and seizure under the Fourth Amendment to the United States Constitution.

147.    As a direct and proximate result of the foregoing, Mr. Johnson suffered the injuries described above.

## COUNT II

**Massachusetts Civil Rights Act, M.G.L. c. 112 § 11IM**
**Lt. Supernor, Moran, Cahill, Bonczek, Does 1-4**

148.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

149.    Defendants' arrested, stripped searched and conducted a cavity search of Mr. Johnson to intimidate him and to serve as lesson to others.

150.    Defendants' violated Mr. Johnson's civil rights under Massachusetts law by threats, intimidation and coercion.

151.    As a direct and proximate result thereof, the plaintiff suffered the injuries and damages as described above.

## COUNT III

**Assault and Battery/Sexual assault and battery**
**Lt. Supernor, Moran, Cahill, Bonczek, Does 1-4**

152.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

153.    Defendants' or Defendant Doe committed the tort of a sexual assault and battery on Mr. Johnson without legal justification, cause, excuse, or privilege.

154.    As a direct and proximate result thereof, the plaintiff suffered the injuries as described above.

**COUNT IV**
Malicious Prosecution
**Lt. Supernor, Moran, Cahill, Bonczek, Does 1-4**

155.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

156.   Defendants' caused criminal charges to be brought against Mr. Johnson for which there was no probable cause, and with malice.  The case against Mr. Johnson was dismissed by the Court.

**COUNT V**
**Civil Conspiracy**
**Lt. Supernor, Moran, Cahill, Bonczek, Does 1-4**

157.   As a direct and proximate result of Defendants' actions, Mr. Johnson suffered damages.

158.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

159.   These Defendants' did conspire to hide their unlawful strip search, cavity search and subsequent warrantless search and seizure of his apartment by preparing and submitting false police reports and by failing to document truthfully the full extent of their interactions with Mr. Johnson or by falsely describing the full-blown search of his apartment as a "protective sweep."

**COUNT VI**
**Intentional Infliction Emotional Distress**
**Lt. Supernor, Moran, Cahill, Bonczek, Does 1-4**

160.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

161.   These Defendants' conspired to hide their unlawful search and seizure, strip, cavity search and the subsequent warrantless search of Mr. Johnson's apartment  by preparing and submitting false police reports by manufacturing probable cause and by stating there was a confidential reliable informant that had engaged in drug transactions with Mr.

Johnson.

162.   The conduct of the Defendants' named in this count constituted intentional infliction of emotional distress.

163.   By their actions, Defendants' subjected Mr. Johnson to reprehensible conduct knowingly, intentionally, willfully, purposely, maliciously and with such reckless disregard of the consequences as to display a conscious indifference to the danger of harm and injury.

164.   As a direct result of the intentional conduct of the defendants in this count, Mr. Johnson suffered severe emotional distress and great pain of body and mind.

## COUNT VII

### 42 U.S.C. § 1983: Monell Claims Against City of Worcester, Gemme and Supervisory claims against Lt. Supernor

165.   Each of the foregoing paragraphs is incorporated by reference.

166.   The policies and customs of the City of Worcester as described above were the moving force behind the violations of Plaintiff's constitutional rights by Defendants.

167.   The policies and customs of the City, Chief Gemme Lt. Supernor and their failure to intervene, train and discipline his/their subordinates was the moving force behind the violations of Plaintiff's constitutional rights by Defendants.

   **WHEREFORE**, Plaintiff hereby respectfully requests the following relief:

   1.   All compensatory damages in a sum according to proof;

   2.   All punitive damages against all Defendants' in a sum according to proof;

   3.   Injunctive relief;

   4.   Award costs of this action, including reasonable attorney's fees and;

   5.   Award such other relief as the Court deems just and proper;

**JURY DEMAND**


Respectfully submitted,
Plaintiff CARL S. JOHNSON
By his attorneys,

*/s/ Hector E. Pineiro*
_____
Hector E. Pineiro (BBO# 555315)
Robert A. Scott (BBO# 648740)
Law office of Hector E. Pineiro
807 Main Street
Worcester, MA 01610
Tel. (508) 770-0600
hector@pineirolegal.com
robin@pineirolegal.com

Dated: July 4, 2017