## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CARL S. JOHNSON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | **NO. 17-40103-TSH** |
| | ) | |
| | ) | |
| CITY OF WORCESTER, LT. CARL SUPERNOR, | ) | |
| PATRICK MORAN, STEVEN BONZECK, | ) | |
| TERRENCE CAHILL, OFFICERS DOES 1-4, and | ) | |
| RELIABLE CONFIDENTIAL INFORMANT, | ) | |
| Defendants. | ) | |

## MEMORANDUM OF DECISION AND ORDER
### March 9, 2020

**HILLMAN, D.J.**

### Background

Carl S. Johnson ("Johnson" or "Plaintiff") has filed suit against the City of Worcester

("City"), Lt. Car Supernor ("Lt. Supernor"), Detective Patrick Moran ("Det. Moran"),

Detective Steven Bonzeck ("Det. Bonzeck"), Detective Terrence Cahill ("Detective Cahill"),

Gary J. Gemme, Chief of Police ("Chief Gemme")[1], Officers Does 1-4, and the reliable

---

[1] This Court's rules of procedure provide that *all* parties shall be named in the caption of the Complaint. *See* Fed.R.Civ.P. 10(a)(Every pleading *must* have caption and title of complaint *must* name all parties). Chief Gemme was not named in the caption of the Complaint. While Chief Gemme was named in the body of the Complaint, there is only a brief reference to him in the nearly 19 pages of factual assertions and he is not named in any Counts of the Complaint except Count VII which asserts claims against the City, Chief Gemme and Lt. Supernor under *Monell v. New York City Dep't of Social Services*, 486 U.S. 658, 98 S.Ct. (1978). However, *Monell* claims are suits against a municipality and therefore, as to such claim, Plaintiff must be suing Gemme in his official capacity (and thus the City is the actual Defendant). Moreover, Plaintiff never served Chief Gemme. Nevertheless, in his memorandum in support of his motion in opposition to Defendants' motion for summary judgement, he asserts that he has filed suit against Chief Gemme (it must also be noted that the title of Plaintiff's opposition is: "Plaintiff Carl Johnson Memorandum of Law in Opposition To Defendants' Bates, Smith, Early's

confidential informant, under 42 U.S.C. §1983 for violation of his constitutional rights.

Plaintiff has also filed Massachusetts state law claims against Defendants for violation of the

Massachusetts Civil Rights Act ("MCRA"), Mass.Gen.L. ch. 12, §§11-H-I[2] and tort law

claims for assault and battery/sexual assault and battery, malicious prosecution, civil

conspiracy, and intentional infliction of emotional distress.   Specifically, Plaintiff alleges that

he was arrested without probable cause, his residence was illegally searched, and he was

subjected to an unlawful body cavity search. This Memorandum and Order of Decision

addresses Defendant's Motion For Summary Judgment (Docket No. 79), Plaintiff's Motion

For Partial Summary Judgment Against Defendants Moran, Cahill and Bonzeck for

Warrantless Entry of Plaintiff's Home (Docket No. 82), and Defendants' motion to strike

Plaintiffs' statement of additional facts and exhibits (Docket No. 95).   For the reasons set

forth below, Plaintiff's motion for partial summary judgment is *denied*, and the Defendants'

motion for summary judgments is *granted*, in part, and *denied*, in part.[3] The motion to strike

Plaintiff's statement of additional facts and exhibits is *granted*.

---

Motion for Partial Summary Judgement on Count I, Count II"—the *only* aspect of this title that is correct is Plaintiff's name). Under the circumstances, I find that Chief Gemme is not a party to this action and therefore, to the extent that he is listed as a party on the Docket, Chief Gemme is dismissed from the case.

[2]   In the Complaint, Plaintiff alleges a claim pursuant to the Massachusetts Civil Rights Act but refers to "M.G.L. c. 112, § 11IM."   Plaintiff's attorneys have been filing complaints in this Court citing to Chapter 112 *for years* and in multiple opinions, the Court has indicated to counsel that Massachusetts General Laws Chapter 112 deals with the registration of certain professions and occupations and that counsel obviously means to cite to Mass.Gen. L. ch. 12, § 11I, which deals with the violation of constitutional rights Counsel has chosen not to fix this error--  instead, in the current Complaint, they refer to "M.G.L. c. 112, §11IM [sic]".   The Court takes it from the [sic] reference that counsel know they are citing to the wrong statute and, inexplicably, have decided not to fix their error. Given this error and the ones pointed out in the previous footnote, I must *again* remind Plaintiff's counsel (as I have done in a prior opinion), that they should review their submissions with significantly more care than they have to date.

[3]   At the hearing Defendants' pointed out that Plaintiff has failed to identify the Officers Does 1-4 or reliable confidential informant ("Doe Defendants") and therefore, they should be dismissed. Plaintiff did not address the issue in his opposition, nor did he otherwise dispute that he has failed to identify the Doe Defendants.

### THE MOTION TO STRIKE[4]

Defendants request that Plaintiff's additional 210 statements of fact and 46 exhibits included in his memorandum in opposition to the Defendants' motion for summary judgment be stricken. I agree with the Defendants that if Plaintiff's additional facts and supporting exhibits do not violate LR, D.Mass. 56.1 (requiring that the parties set forth a *concise* statement of the material facts in dispute) outright, they clearly violate the spirit of the rule. More significantly, however, the Plaintiff has included facts and materials that under the broadest interpretation of "relevancy" are not germane to the case. Those facts which have relevancy relate primarily to Plaintiff's *Monell* claim which the Court intends to bifurcate, and therefore, will not address in this Memorandum and Decision. For these reasons, the motion to strike is *granted*.

### THE CROSS-MOTIONS FOR SUMMARY JUDGMENT

#### Standard of Review

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "'A "genuine" issue is one that could be resolved in favor of either party, and a

---

Under these circumstances, summary judgment shall enter in favor of the Doe Defendants.

[4] Johnson has submitted a response to Defendants' statement of material facts. Embedded in one or more responses to particular factual assertions, Johnson "moves to strike" certain facts and/or supporting exhibits. If Johnson believed that exhibits cited in support of Defendants' factual assertions were inadmissible, he should have filed a formal motion to strike. His request to strike such factual assertions and exhibits made in the body of his response is ineffectual and will not be addressed by the Court. Additionally, Plaintiff's non-factual, editorial comments throughout the response as well as the labelling of a substantial number of Defendants' factual assertions as based on false testimony/allegations is improper.

"material fact" is one that has the potential of affecting the outcome of the case." *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (quoting *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)).

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof. *Sensing,* 575 F.3d at 153. The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Id.,* at 152. "'Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.'" *Id.* (citation to quoted case omitted). "'[T]he nonmoving party "may not rest upon mere allegations or denials of the [movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden of proof at trial." *Id.* (citation to quoted case omitted). The nonmoving party cannot rely on "conclusory allegations" or " improbable inferences". *Id.* (citation to quoted case omitted). " ' The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." ' " *Id.* (citation to quoted case omitted).

## Facts

Det. Moran has been employed by the Worcester Police Department ("WPD") since 1994 and has worked as an investigator for the Vice Squad since 2000. On August 28, 2014, he had been investigating Plaintiff for fifteen months and had conducted approximately twelve controlled purchases of cocaine from him through a reliable confidential informant

("CI")[5].   Det. Moran had conducted a controlled purchase of crack cocaine within the proceeding two weeks involving Johnson selling the drugs from a gray Cadillac Deville ("Deville") to the CI. The Deville was registered to Kipko Johnson ("Kipko"). Johnson had a driver's license that listed his address as 982 Main Street, apartment 2. Johnson lived alone at this address. Det. Moran had also observed a gray Cadillac[6] return to 982 Main Street after seveeral other controlled purchases of cocaine by the CI.

On August 28, 2014, Johnson left Worcester just before 11:00 a.m. in his Deville and drove to Twin River Casino in Providence, Rhode Island. He returned to Worcester just before 7:00 p.m. He did not go to his apartment on Main Street, rather he drove tor Fruit and Dayton Streets to pick up Wesley Threats ("Threats") at his home so they could go play basketball over by the John Street School.   He was at some point observed by Det. Moran who followed him. At some point, Det. Moran advised other WPD Vice Squad officers of his

---

[5]   According to Johnson, the WPD did not preserve any samples pertaining to alleged controlled buys which the CI made from Johnson—they were destroyed during the course of an investigation by the Massachusetts State Police (at the request of the WPD) and there are no photographs of the alleged samples or results of any field tests conducted on them (other than a field test for the drugs allegedly sold by Johnson to Threats on August 28, 2014 which is described *infra*). Plaintiff has moved to strike all references to the controlled buys and other asserted facts on the grounds that the supporting documentation is not admissible. However, as mentioned previously, Plaintiff did not properly move to strike the asserted facts and/or supporting documentation relating thereto. The Court will reserve ruling on whether such evidence will be admissible at trial until the issue has been properly raised and briefed. I will note that to the extent that the Court has not considered factual assertions made by the Defendants, it is because of their failure to properly cite to the page numbers to supporting documentation. *See* LR., D.Mass. 56.1 (moving party shall include concise statement of material facts with *page references* to affidavits, depositions and other documentation)(emphasis added). Because defense counsel does not have a history of failing to comply with this Court's rules and because the cited documents were short and the information easily ascertainable, I have given Defendants some leeway and have considered most of their asserted facts.

[6]   There was a second gray Cadillac which was at times allegedly used by Johnson when the CI made controlled purchases from him. The record is somewhat unclear as to which Cadillac was being used at any given time and apparently, two different license plates were transferred back and forth between the two cars. The second Cadillac was also registered to Kipko.

investigatory information and they all began to follow the Deville, which went to the

intersection of Fruit and Hampden Streets in Worcester.

Det. Bonczek has also been employed with the WPD since 1994 and has worked as a

narcotics investigator for the Vice Squad since approximately 2012.   On August 28, 2014,

Det. Bonczek, who was about three car lengths away, observed a tall, thin, black male, about

sixty years-old, enter the Deville for a short period of time and then exit, walking away from

the vehicle. He testified that the car remained stationary. While the male was in Johnson's car,

Det. Bonczek could see them engaged in conversation while fixated on something between

them. He also observed them reached toward each other. Based on his training and

experience, his impression was that he had just witnessed a hand-to-hand street-level drug

transaction, information that he conveyed to the other officers.   According to Threat, after he

got into Johnson's car, they started driving towards some playfields on John Street, but when

they got to Hampden Street, Threats told Johnson he changed his mind and he wanted to be

let out there.   Threats got out and started walking away.

Det. Moran also believed at this time, given the information he had obtained through

his investigation of Johnson and from Det. Bonczek, that a street-level drug transaction had

taken place. However, he did not witness any hand-to-hand transaction between Johnson and

Threats. Det. Moran approached and announced himself to the tall, thin male (now known to

be Threats) who made a quick throwing gesture behind his back with his right hand as Det.

Moran approached.   Det. Moran knew from his training and experience that this was

common practice among both drug users and dealers to discard evidence.   When Det. Moran

retrieved the item, it was a small off-white colored chunk in a small knotted plastic bag,

which he believed to be crack cocaine. Threats was placed under arrest for possession of a class B substance and placed in the back of a police wagon. He was frisked but not strip searched. According to Threats, he had purchased a rock of crack cocaine for $40 with some friends earlier in the day and had intended to smoke it.[7]   He admits when he saw the officer coming up to him, he took it out of his pocket and threw it away.

Det. Moran radioed the information to the other Vice Squad officers who were following Johnson's vehicle. Det. Moran told Det. Cahill he wanted the vehicle stopped. Det. Cahill stopped Johnson's vehicle at the intersection of May and Dewey Streets in Worcester. Det. Cahill instructed Johnson to put the car in park and get out. Officers removed Johnson from the car and ordered him to the ground. He refused and they started searching him. None of the officers displayed badges, but Johnson understood they were police. He was placed under arrest for distribution of a class B substance. When he was stopped, Johnson had $40 in his hand, which was confiscated, along with $122.00 in his wallet, two cell phones and his keys. Forty dollars, the amount of money Johnson had in his hand, is the standard street value of a rock of crack cocaine. Additonally, the use of two cell phone can be an indicator to the police that the person is a drug dealer as typically one phone is dedicated to drug customers, and the other to family and "non-business" contacts. According to Johnson, the $40 (which he intended to use to buy soap and do his laundry) was in a cup, he had $155.10

---

[7] As noted by Defendants, Johnson cites to Det. Moran's deposition as evidentiary support for this statement.   However, Det. Moran's testimony does not support this assertion of fact. Since the Court was readily able to find the supporting testimony in Threat's deposition, as I did with the Defendants, I have granted Plaintiff some leeway and considered the statement.

on him, and only one cellphone which fell out of his pocket and under the car when he was removed from the Deville.[8]

At the time of Johnson's arrest, Det. Moran provided him his *Miranda* warnings. After Johnson stated he understood his rights,   Det. Moran asked him if he wished to speak to with him and Johnson answered affirmatively. Johnson denies having received any *Miranda* warnings. Det. Moran explained that he was under arrest and explained the charges against him. Det. Moran asked Johnson where he lived and Johnson stated that he lived at 982 Main Street, apartment 2, right side. In response to a question from Det. Moran, Johnson stated that no one was home at this address. No drugs were detected in a pat-down search of Johnson before he was placed in the patrol wagon and according to Det. Moran, he was not strip searched at any time after his arrest. The other officers present do not remember who placed Johnson into the police wagon, but they all assert that to their knowledge, he was not strip searched.

According to Johnson, he was searched three times outside of his car, his car was searched, and then he was placed in the police wagon. After he was placed in the back of police wagon, Det. Moran, who had his house keys on his finger, told him to drop his shorts. Because Johnson was handcuffed, Det. Moran pulled his shorts down to his ankles. He then told Johnson to bend down and cough. Det. Moran made him cough again and then had him turn around and cough a third time as he pulled his buttock cheeks apart. Threats said that he

---

[8] Johnson asserts that he had only one cellphone with him which fell out of his pocket and onto the ground when he was removed from the car.   However, in his response to Defendants' statement of facts, he cites to his own deposition testimony in which he states that Det. Moran found a cellphone in the pocket of his shorts when he pulled them down in the police wagon.

was three feet away from Johnson in the police wagon. He testified that he "recalled" them dropping Johnson's pants, that he was "bared ass" and that he "probably" saw someone manipulate Johnson's buttocks. Threats had turned his head away because he did not want to see another man's body. According to Johnson, Det. Moran took the keys to his apartment and told him he was going to search it because he knew he was a drug dealer. Johnson told Det. Moran that what they were doing to him was wrong, but he couldn't do anything to stop it.

When officers arrived at Johnson's apartment building, they observed an adult male coming out of the building and getting into a Nissan Pathfinder ("Pathfinder") that was parked on the street.   The Pathfinder had the same license plate that had been on a gray Cadillac that was previously operated by Johnson when the CI made controlled buys of crack cocaine. Det. Moran stopped the man and explained to him why the police were at this address. He identified himself as Kipko, stated he was Johnson's son and that he had just came from his father's apartment. Det. Moran asked Kipko if anyone else was inside the apartment. Despite having just come from the apartment, Kipko stated he was not sure whether anyone was there. According to Kipko, he was inside the vehicle which was running when Det. Moran and another officer approached without initially identifying themselves as police officers.   They told him to turn off the vehicle and step outside. Kipko did so and he was brought to the rear of the car and patted down, searched and asked if his father sold drugs out of his car. According to Kipko, he was never asked if anyone was inside the apartment.

Dets. Moran, Cahill and Bonczek proceeded to apartment 2R.   Det. Moran acknowledges that he did not ask Johnson for permission to search the apartment. Once at the

door, they could hear voices coming from within the apartment.   Det. Moran testified that he was concerned at that point that there were people inside who could compromise the investigation and destroy evidence. Det. Cahill used the key obtained from Johnson to open the apartment door so they could enter and check to see if there was anyone inside. Upon entry, the detectives searched larger areas that could conceal person(s) who could pose a danger to them or destroy evidence. There was no one inside the apartment; the voices they had heard were from a television on inside the apartment. They did not search through cabinets or drawers, but quickly went through to impound the residence from the inside to wait for the issuance of a search warrant. The officers used flashlights to look around. Det. Moran said he would have looked under the bed to see if anyone was there. Det. Bonczek stated that no drawers were opened, and no furniture or mattresses were moved.   The detectives exited the apartment and secured it with the keys. They did not seize any evidence during their entry, and no evidence from the apartment was offered against Johnson. They were in the apartment for only a few minutes and after it was secured, they remained in the hallway. While incident reports state that officers entered the apartment to do a protective sweep, Dets. Moran and Bonczek have testified that they entered the apartment to prevent the destruction of evidence and to impound it while awaiting a search warrant. Det. Cahill described their actions as a protective sweep as a precursor to impoundment. Ultimately, they did not obtain a search warrant because when they saw Kipko exiting the apartment, they believed that any potential evidence would have been taken or destroyed.

Kipko asserts that it was dark out at the time he was being questioned by police and he could see flashlights moving around inside the apartment.   He also states that he told officers

he was not giving them permission to search the apartment and hoped they hadn't taken his

keys. He was told by Det. Moran that they had his father's keys and that he had given them to

the officers so they could search.   Kipko observed flashlights in the apartment for about 25

minutes. When Kipko left the apartment, everything was in order.

    Lt. Supernor has worked for the WPD for twenty-three years and worked in the vice

squad from 2005 until approximately 2017. He was a sergeant in the Vice Squad at the time

of the alleged incident.   Lt. Supernor did not participate in the surveillance or the stop of

Johnson but was informed throughout the interaction via the police radio.   After Johnson's

arrest, Lt. Supernor went to his apartment building, but did not enter the apartment. Lt.

Supernor had a conversation with Det. Moran outside of Johnson's building. He did not

authorize the officers to conduct a protective sweep. He believed that they went to the

apartment to see if the key fit the tumbler and if it did, they would then take steps to secure

the apartment. Another officer stated that he believed that Lt. Supernor entered the apartment

building.

    The next day, Det. Moran applied to the district court for the issuance of a criminal

complaint against Johnson for the distribution of cocaine.   Johnson appeared for arraignment

in Worcester District Court on August 29, 2014, on the charge of distribution of cocaine. He

was released on personal recognizance and was not held in custody following arraignment.

According to Johnson, when he returned to his apartment on or about August 30th, the place

was "ransacked." Drawers had been pulled out and a mattress had been moved to the side.

Nothing in his apartment was damaged. One of the keys from his key ring had been taken off

and left in the bathroom.   Johnson denies being a drug dealer and denies having sold any

drugs to Threat on August 28, 2014.   He continues to have nightmares as a result of the

incident particularly relating to, the strip search. Threat denies having purchased any drugs

from Johnson. Threats was not known to the officers prior to August 28, 2014.

<u>**Discussion**</u>

<u>Whether Defendants Violated Plaintiff's Constitutional Rights When They Entered His
Apartment.</u>

Both parties are seeking summary judgment as to Johnson's claim that the police violated

his Fourth Amendment rights by entering his apartment without a warrant and conducting a

search. Johnson contends that the police entered his apartment and conducted a full search that

took approximately 25 minutes and involved opening drawers and moving items such as his

mattress. The Defendants acknowledge that they entered Johnson's apartment, but claim they did

so in order to secure the premises until they obtained a search warrant. More specifically, they

believed that someone else could be in the apartment based on comments from Kipko and noises

they heard when the stood outside so they entered to conduct a "protective sweep", *i.e.*, a search

of areas where persons could be located who could be a danger to the officers and/or destroy

evidence. After conducting the sweep, which they assert took no more than a couple of minutes,

they left the apartment, locked it and remained outside so no one could enter pending issuance of

a warrant. Both sides agree that nothing in the apartment was damaged.

The Fourth Amendment which protects "[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. Const.

amend. IV, bars unreasonable searches. *Maryland v. Buie*, 494 U.S. 325, 331, 110 S.Ct. 1093

(1990).   "The Supreme Court has long held that 'physical entry of the home is the chief evil

against which the wording of the Fourth Amendment is directed.'" *United States v. Delgado-*

*Perez*, 867 F.3d 244, 251 (1st Cir. 2017)(quoting *Payton v. New York*, 445 U.S. 573, 585, 100

S.Ct. 1371 (1980)).   Thus, "'a warrantless search of a private residence is presumptively

unreasonable unless one of a few well-delineated exceptions applies.'" *Id.* (citation to quoted case

omitted). For example, the Supreme Court has recognized that as a precautionary measure, police

officers may conduct a limited search without a warrant, probable cause or reasonable suspicion

in conjunction with an in-home arrest in the areas immediately adjacent to the place of arrest for

safety reasons, including looking in closets. *Buie*, 494 U.S. at 334, 110 S.C.t 1093.   In

conjunction therewith, when officers possess a reasonable belief based on specific and

"articulable facts, which taken together with rational inferences from those facts, would warrant a

reasonably prudent officer in believing that the area to be swept harbors an individual posing a

danger to those on the arrest scene[,]" they may conduct a "cursory inspection" of areas "where a

person may be found." *Id.*, at 334-35, 110 S.Ct. 1093. Such a sweep must last "no longer than

than is necessary to dispel the reasonable suspicion of danger, and in any event no longer than it

takes to complete the arrest and depart the premises." *Id.*, at 335-36, 110 S.Ct. 1093. Obviously,

this case differs from *Buie* in that the police did not enter Johnson's home pursuant to a valid

arrest warrant as he was arrested based on probable cause after being pulled over in his car well

away from his apartment.   The question in this case is whether the officers were justified in

making a warrantless entry into Johnson's apartment to conduct the type of protective sweep

outlined in *Buie* for the purposes of officer safety, *or* to preserve evidence while applying for a

search warrant.

      The First Circuit has recognized that the entry into the home to conduct a protective sweep

may be justified where the arrest takes place "'just outside the home,' because such an arrest 'can

pose an equally serious threat to arresting officers as one that occurs in the home.'" *Delgado-*

*Perez*, 867 F.3d at 351 (citation to quoted case omitted).   Such protective sweeps will be upheld where the police officers have "articulable suspicion that some person other than the one arrested could be present and pose a danger to the officers." *Id.* At 252. The court considered information known to the police such as that: the defendant was known to have numerous acquaintances who were known to be potentially armed and violent and who had been given an opportunity to hide prior to the police entering the premises; the police were told that someone was inside the residence of a known gang member; and a shooting had just taken place nearby in a high crime area and circumstances suggested that an adult was concealing himself in the house. *Id.* In this case, Johnson was arrested while driving his car in a different area of Worcester well away from his apartment and even assuming that the police had reason to believe someone may be in the apartment, there is nothing in the record that would support a finding that they had reason to believe that they were in any danger. More specifically, while Det. Moran believed that Johnson was a drug dealer, there is nothing in the record to suggest that he was ever seen with a weapon, had a history of violence, associated with violent or dangerous persons or lived in a high crime area.  *Accord Delgado-Perez*, 867 F.3d at 253; *United States v. Serrano-Acevedo*, 892 F.3d 454 (1st Cir. 2018). On this record, I find that as a matter of law, the Defendants did not have the right to enter Johnson's apartment to conduct a protective sweep for *safety* reasons. That leaves Defendants theory that they had the right to enter the apartment to prevent the destruction of potential evidence, that is, for the purpose of securing such evidence while they obtained a search warrant.

The exigent circumstances exception to the warrant requirement permits entry into a residence without a warrant where the officers have probable cause to enter such as when the totality of the circumstances create "a fair probability that contraband or evidence of a crime will

be found in a particular place." *United States v. Almonte-Baez*, 857 F.3d 27. 31 (1ˢᵗ Cir. 2017); *see also* cases cited therein. In addition to probable cause, to fall within the doctrine, "an exigency [must] have existed sufficient to justify the warrantless entry.   Exigent circumstances are present when 'there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant.'" *Id.* At 31 (citation to quoted case omitted). Generally, the "exigent circumstances exception [may be invoked] when [there exists] an 'objectively reasonable basis," for concluding that, absent some immediate action, the loss or destruction of evidence is likely." *Id.* at 32. Taking the facts in a light most favorable to the Defendants, at the time that they entered Johnson's apartment, Det. Moran, who was one of the officers who entered the apartment, knew that there had been an ongoing investigation of Johnson for selling drugs, that he was observed leaving the apartment prior to a number of controlled buys taking place out of his car, and that he had just been observed conducting what police believed to be a hand-to-hand transaction. Additionally, according to the Defendants, just prior to the transaction with Threats, Johnson had been seen leaving his apartment in the Deville, based on their questioning of Kipko, they were unsure if someone was still in the apartment who could destroy potential evidence, and upon reaching the door to the apartment, they heard voices coming from inside.

Although it is a close call, on this record, I find that there is a genuine issue of material fact both as to whether the Defendants had probable cause to believe evidence of a crime could be found inside the apartment and as to whether entry into Johnson's apartment was necessary to prevent the imminent loss of such evidence. *Accord, Id.* at 33. Therefore, Plaintiff's motion for partial summary judgment is denied. At the same time, taking the facts in a light most favorable to Johnson, there are genuine issues of material fact which preclude a finding that the entry was justified as a matter of law. More specifically, Johnson denies that he was a drug dealer and that

there is any evidence supporting the theory that he sold drugs, that he sold Threats drugs on August 28, 2014, or that Kipko told any of the officers who responded to Johnson's apartment that day that he was unsure whether someone was inside. Moreover, even if a jury were to find that probable cause and exigent circumstances existed such that a warrantless entry into Johnson's apartment was not violative of the Fourth Amendment, taking the facts in a light most favorable to Johnson, there remains a genuine issue of material fact as to whether the search exceeded the scope of what would have been proper under the circumstances, *i.e.*, a cursory sweep to ensure that there was no one inside who could destroy evidence. Therefore, Defendants' motion for summary judgement on this this claim is also denied.[9]

<u>Defendants' Motion for Summary Judgment on Johnson's Remaining Civil Rights Claims and Johnson's State Law Tort Claims</u>

Defendants, Lt. Supernor, and Dets. Moran, Cahill and Bonczek, seek summary judgment on Johnson's Section 1983 and MCRA claims against them for violation of his Fourth Amendment right to be free from illegal seizure, *i.e.*, false arrest, for violation of his Fourth Amendment right as the result of an illegal strip search, and for violation of his right to due process. They also seek summary judgment with respect to Johnson's state law tort claims for assault and battery, malicious prosecution, civil conspiracy and intentional infliction of emotional distress.

The motion for summary judgment is granted as to Johnson's Section 1983 undeveloped, generically pled claim for violation of his due process rights, which Johnson has not bothered to

---

[9] Defendants' argument that even if a Fourth Amendment violation occurred, summary judgment is appropriate where a plaintiff cannot establish actual damages is meritless and requires no further discussion. *See Aubin v. Fudala,* 782 F.2d 280, 286 (1ˢᵗ Cir. 1983)( "In the absence of a showing that the Aubin parents suffered actual damages attributable to the search … a nominal damages award is proper.")

address in his opposition, and his state law claims for malicious prosecution, civil conspiracy and intentional infliction of emotional distress as Johnson has failed to allege facts which would support a finding against any Defendant with regard thereto. Accordingly, the Court will focus on whether summary judgment is warranted on Johnson's civil rights claims for false arrest and illegal body cavity search and his state tort law claim for assault and battery.

### *False Arrest*

Johnson's Section 1983 claim for false arrest is rooted in the Fourth Amendment right to be free from an unreasonable seizure. Whether the arrest of a suspect complies with Fourth Amendment principles depends on "whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense." *Beck v. State of Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223 (1964).   First, Johnson has asserted claims for false arrest against Lt. Supernor, however, he has not asserted *any* facts which would support a finding that Lt. Supernor was involved in the decision to arrest him either directly or in his supervisory capacity. Section 1983 imposes liability only on officers who were personally involved in the deprivation of a constitutional right, which requires a plaintiff to show a causal connection or affirmative link between a defendant and the federal right of which the plaintiff was deprived. Since Johnson has not made any attempt to link Lt. Supernor to his arrest, he is entitled to summary judgment. It is a closer call whether the record would support a finding that Dets. Cahill and Bonczek took part in Johnson's arrest, however, because as discussed below I find that there was probable cause for the arrest, for purposes of this decision, I will assume that they did.

Det. Moran had been investigating Johnson for an extended period and, utilizing a CI, conducted several controlled buys of illegal drugs from him.   On August 28, 2014, officers following Johnson in his Deville (a car which Johnson had been driving when Det. Moran conducted prior controlled buys) and surveilled Johnson picking up Threats. Det. Bonczek observed Johnson and Threats conversing and having an interaction whereby they appeared to hand something to each other. Threats then got out of the car and when approached by Det. Moran threw something that was in his hand behind him—Det. Moran recovered what appeared to be a rock of crack cocaine. Johnson's vehicle was stopped and when searched, officers found $40 either in his hand or a cup within the area of his control; officers knew that a rock of crack cocaine sells in Worcester for about $40.   Based on the record before me, I find as a matter of law that the individual Defendants involved in Johnson's arrest had probable cause to believe he had committed an offense and therefore, they are entitled to summary judgment on this claim. In making this determination I find that it is irrelevant that Threats has testified that he bought the rock of crack cocaine from someone else earlier in the day and that Johnson denies ever selling drugs (to Threats or anyone else). The relevant inquiry is *what is known to the officers* at the time of arrest. Summary judgment is also granted to the Defendants on Johnson's parallel MCRA false arrest claim.

### *Illegal Body Cavity Search*

Little time need be spent addressing Johnson's claim that he was subjected to an illegal body search in violation of the Fourth Amendment. First, there are no factual allegations that would support a finding that Lt. Supernor had any involvement in the alleged strip search of Johnson either directly or in his supervisory capacity, nor are there any allegations that would support a finding that Dets. Cahill or. Bonczek played any role in the alleged search. Therefore,

summary judgment is granted as to these individuals. As to Det. Moran, there are genuine issues

of material fact which preclude summary judgment in his favor on this claim and Johnson's

parallel MCRA claim. More specifically, there are genuine issues of as to whether Johnson was

subjected to a body cavity search and, if so, the scope of the search that took place.

Because there are no allegations which would support a finding that they took part in the

alleged search of Johnson's person, summary judgment shall also enter for Lt. Supernor and Dets.

Cahill and Bonczek on Johnson's claim for assault and battery. Det. Moran's motion for summary

judgment on the assault and battery claim is denied.

<u>Whether Defendants are entitled to To Qualified Immunity On The Remaining Claims</u>

'Qualified immunity is a judge-made doctrine designed to "balance two
important interests—the need to hold public officials accountable when they
exercise power irresponsibly and the need to shield officials from harassment,
distraction, and liability when they perform their duties reasonably " '   The
doctrine thus protects from liability for civil damages all public officials other than
those who, 'from an objective standpoint, should have known that their conduct
was unlawful.'

The qualified immunity inquiry has two parts. A court must decide
whether the plaintiff has made out a violation of a constitutional right and, if so,
whether the right was clearly established at the time of the violation. This second
part, in turn, has two aspects. The first focuses on the clarity of the law at the time
of the violation. The other aspect focuses more concretely on the facts of the
particular case and whether a reasonable defendant would have understood that his
conduct violated the plaintiff's constitutional rights. The "salient question" is
whether the state of the law at the time of the violation gave the defendant fair
warning that his particular conduct was unconstitutional.

*Drumgold v. Callahan*, 707 F.3d 28, 42 (1st Cir. 2013)(internal citations and citation to quoted

case omitted). There are numerous issues of material fact relating to Johnson's surviving claims

which preclude the Court from finding that the individual Defendants are entitled to qualified

immunity. Therefore, Defendants' motion for summary judgment on qualified immunity grounds

is denied.

*Plaintiffs' Claims Against the City and Lt. Supernor in his Supervisory Capacity*

The Court does not find that on this record, it would be beneficial to undertake an analysis of the *Monell* claims against the City, or the Supervisory Claims against Supernor (as to the search of Johnson's residence) as it is the Court's intention to bifurcate the trial.   The Section 1983 claim against the individual Defendants will be tried first.   If the jury finds that any individual Defendant committed a constitutional violation, the Court will schedule a separate trial on the *Monell* and/or supervisory claims.   Prior to such trial, the Court will likely permit the parties to file dispositive motions on such claims.

## Conclusion

It is hereby Ordered that:

1. Defendant's Motion For Summary Judgment (Docket No. 79), is ***granted***, in part and ***denied***, in part**;** [10]

2.   Plaintiff's Motion For Partial Summary Judgment Against Defendants Moran, Cahill and Bonzeck for Warrantless Entry of Plaintiff's Home (Docket No. 82) is ***denied***; and

3. Defendants' motion to strike Plaintiffs' statement of additional facts and exhibits (Docket No. 95) is ***granted***.

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**

---

[10] Based on the rulings herein, the following Defendants have been dismissed from the case: Chief Gemme, Steven Bonczek, Officers Does 1-4, and the confidential reliable informant. Lt. Supernor remains in the case in both his supervisory capacity and with respect to the claim against him for any direct role he played with respect to Johnson's claim for the illegal search of his residence.